## A06A2253. IN RE JEFFERSON.
(645 SE2d 349)

ANDREWS, Presiding Judge.

Sherri Jefferson appeals from a juvenile court's finding that she was in contempt of court in the course of an appearance at a delinquency hearing. We find no error and affirm.

> On appeal of a criminal contempt conviction the appropriate standard of appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

(Citation, punctuation and footnote omitted.) *In re Waitz*, 255 Ga. App. 841, 842 (567 SE2d 87) (2002).

So viewed, the record shows that at the time of the alleged contempt, Jefferson was an assistant public defender who was assigned to represent juvenile defendants in the Juvenile Court of Glynn County. The alleged improper statements made by Jefferson occurred during a delinquency hearing in which she represented the minor child B. W. Among other offenses, B. W. was charged as a party to the crime of aggravated battery based on a shooting that occurred outside of an acquaintance's home.

During the delinquency hearing, the prosecution sought to prove that B. W. had supplied the handgun used in the shooting and had encouraged the shooter to fire the handgun at the victim. As part of her examination of the law enforcement officer who had investigated the shooting, Jefferson attempted to question the officer about certain statements made to him by the alleged shooter, who had not yet testified. The prosecution objected on hearsay grounds, and the juvenile court sustained the objection. The juvenile court went on to suggest that in order to avoid the hearsay problem, Jefferson should first call the alleged shooter to the stand and question him about the statement, and then recall the investigating officer and question him about any inconsistencies in the shooter's statement. In response, Jefferson requested that she instead be permitted to continue questioning the officer about the shooter's statement and then call the shooter himself, rather than vice versa. When the juvenile court said that he would not allow her to proceed in that manner, Jefferson objected by stating, "[T]hat's a gross interference with the way that I can represent my client, Your Honor."

Later during the examination, the officer testified that B. W. had told the shooter to fire the handgun and had "egged it on." Jefferson then asked, "Can you show me in the shooter's statement where he told you that [B. W.] said shoot him?" The officer responded that "[i]t's not in the shooter's statement." When Jefferson started to follow up on the officer's response, the prosecution objected on hearsay grounds to any testimony about what the shooter said or did not say to the officer. The juvenile court then ruled that he would give no probative value to any hearsay contained in the officer's testimony; after further discussion, the court also held that the police officer's report was inadmissible. The juvenile court then reiterated its ruling: "I've already overruled your proffer of [the police officer's] report and also your efforts to get [the officer] to testify about his conversation with [the shooter]." When Jefferson continued to resist, the court commented that "[w]hat you're doing now is making a closing argument," and said that it "had heard enough on this issue." Jefferson then protested: "I just find the Court is biased in its view. You say that you're not prejudging the case but it seems to me like you've made up your mind and any and everything that I do to effectively defend my client I'm being rebutted."

At the conclusion of the delinquency hearing, the juvenile court served a notice of contempt and show cause order alleging eight instances of contempt committed by Jefferson, including her "gross interference" and "biased" statements. The presiding judge then recused himself so that another judge could preside over the contempt proceedings. After a new judge from the juvenile court had been appointed, a hearing was held on the show cause order in which

Jefferson testified. Following the hearing, the juvenile court issued an order finding Jefferson not guilty of six of the eight instances of alleged contempt. However, the juvenile court found that Jefferson's "gross interference" and "biased" statements constituted contemptuous conduct. On May 1, 2006, and citing OCGA § 15-11-5, the juvenile court sentenced Jefferson to ten days incarceration for the first statement and twenty days incarceration for the second statement without specifying whether the sentences would run concurrently or consecutively, and also granted "a supersedeas of this Order pending the resolution of any appeal hereof." One week later, the juvenile court amended its order to provide that the sentences would run consecutively, and again granted supersedeas.

1. As a preliminary matter, we reject Jefferson's contention that the juvenile court's jurisdiction does not extend to matters of criminal contempt or to the imposition of sentences in such cases. As a constitutional court, the juvenile court was authorized both to adjudicate the matter and to impose punishment. See Ga. Const. of 1983, Art. VI, Sec. III, Par. I (jurisdiction of juvenile court is "as ... provided by law"); OCGA § 15-11-5 (a) (a juvenile court "may punish a person for contempt of court for willfully disobeying an order of the court or for obstructing or interfering with the proceedings of the court"); *In re Burton*, 271 Ga. 491, 493 (2) (521 SE2d 568) (1999) (juvenile court has jurisdiction to issue contempt orders against counsel appearing before it); *In re Liles*, 278 Ga. App. 496 (629 SE2d 492) (2006) (affirming juvenile court's adjudication of contempt arising from violation of its protective order).

2. The crux of this appeal is Jefferson's contention that the evidence was insufficient to sustain her conviction.

As the United States Supreme Court has acknowledged, the Georgia courts have reserved to themselves the common law power to describe criminal contempt in this state, rejecting legislative efforts to limit that power, and construing state constitutional provisions so as to preserve it. See *Wood v. Georgia*, 370 U. S. 375, 386 (82 SC 1364, 8 LE2d 569) (1962), citing *Atlanta Newspapers v. State of Ga.*, 216 Ga. 399 (116 SE2d 580) (1960), and *Bradley v. State*, 111 Ga. 168, 171-172 (36 SE 630) (1900) (under the Georgia constitution, the Georgia legislature can limit the punishment for, but not the definition of, criminal contempt). "The test applied to determine whether a statement is contemptuous is whether [the statement represents] a clear and present danger to [the] orderly administration of justice." *Garland v. State*, 253 Ga. 789, 790 (2) (325 SE2d 131) (1985).

Jefferson accused the judge of (a) "gross interference" with her efforts to represent her client and (b) being "biased" and prejudiced against her client.

(a) "A judge's authority to maintain decorum in his courtroom does not depend upon the correctness of his rulings. No matter how unsound[ ] or erroneous one may consider them to be, they afford no justification or excuse for contempt of the court." *White v. State of Ga.*, 218 Ga. 290, 294 (3) (b) (127 SE2d 668) (1962). "[T]aking into account the setting in which the statement is made," *Garland*, supra, 253 Ga. at 791 (2), we note that Jefferson made her claim of "gross interference" in the face of the juvenile court's repeated adverse rulings. Such a claim not only mistakes the "orderly administration of justice" for its opposite, but openly accuses the court of perpetrating misrule. The evidence sufficed to sustain Jefferson's conviction for criminal contempt. See *White*, supra, 218 Ga. at 292-293, 294 (3) (b) (counsel's comments, including that if he erred "in the slightest," the trial court would "give [him] the works," amounted to criminal contempt).

(b) The record shows that the trial court had definitively informed counsel that its consideration of the matter was closed when counsel attacked the trial court at the core of its function as an impartial arbiter of justice. Indeed, the judge hearing the contempt matter found Jefferson's second statement at issue to be "the absolute zenith of contempt a trial participant can express for a Court."

If and when counsel believes that a trial court is biased against her client, she should move for recusal, thus guaranteeing herself, her client, and the trial court all the safeguards which accompany such a motion, including the designation of a new judge to hear the matter. Compare *In re McLarty*, 152 Ga. App. 399, 400-401 (2) (263 SE2d 194) (1979) (motion to recuse made with "some evidence in support of it" is not contemptuous). It is within a trial court's power to forbid a disgruntled lawyer from impugning the integrity of a court at the moment the inclination strikes her, and to hold her accountable, after due process, when such an attack occurs. As Judge Pope wrote in *Smith v. Adams*, 161 Ga. App. 820, 821 (3) (288 SE2d 775) (1982):

> Words which bring the court into disrespect, which offend[ ] its dignity or affront[ ] its majesty, or challenge[ ] its authority, constitute contempt. A solicitor is an officer of the court and whenever he impedes or obstructs the administration of justice by the use of contemptuous words he may be properly punished.

The evidence was sufficient to support the juvenile court's finding. Id. (counsel's assertion that trial court "can't tell [the law]" authorized a finding of contempt); see also *In re McLarty*, 150 Ga. App. 395, 396 (2) (258 SE2d 10) (1979) (counsel who informed trial court immediately

after adverse ruling that "maybe the Court of Appeals will understand the law" is guilty of contempt).

3. Finally, Jefferson attacks the original sentence as cruel and unusual punishment, and also asserts that the juvenile court lacked the power to amend its May 1 order after its grant of supersedeas in that same order. We reject these contentions.

A juvenile court has the discretion to grant supersedeas in contempt cases arising from conduct in the presence of the court during the progress of a proceeding. See OCGA § 15-11-3 (appeals from final judgments of a juvenile court "shall be taken ... in the same manner as appeals from the superior court"). The trial court's discretionary grant of supersedeas in its original order of May 1 did not result in a divestment of its jurisdiction; that event occurred only when Jefferson filed a notice of appeal. OCGA § 5-6-38 (a); *Couch v. United Paperworkers Intl. Union*, 224 Ga. App. 721 (482 SE2d 704) (1997) (proper and timely filing of notice of appeal is "an absolute requirement to confer jurisdiction upon the appellate court").

Nor did the juvenile court exceed its powers when it clarified its original order to specify that the two sentences of twenty days and ten days for each contemptuous act were to run consecutively, since the eventual sentence imposed did not exceed the applicable statutory limits. See OCGA § 15-6-8 (5) (trial court has the power to "punish contempt by fines not exceeding $500.00 and by imprisonment not exceeding 20 days"); *Gay v. Gay*, 268 Ga. 106 (1) (485 SE2d 187) (1997) (penalties provided in OCGA § 15-6-8 (5) are applicable to each separate act found by the trial court to be contemptuous); *Johnson v. State*, 258 Ga. App. 33, 36 (572 SE2d 669) (2002) (sentence of three consecutive twenty-day sentences for three instances of contemptuous behavior was supported by the evidence).

The juvenile court was divested of jurisdiction in this case only when Jefferson timely filed her notice of appeal on June 5, within 30 days of the May 8 amended order. See *Nodvin v. West*, 197 Ga. App. 92 (397 SE2d 581) (1990) (trial court's correction of a certified final judgment was itself a directly appealable final order).

*Judgment affirmed. Johnson, P. J., Blackburn, P. J., and Ellington, J., concur. Barnes, C. J., Miller and Bernes, JJ., concur in part and dissent in part.*

BERNES, Judge, concurring in part and dissenting in part.

While I fully concur in Divisions 1 and 3 of the majority opinion, I respectfully dissent from Division 2 because I do not believe that Jefferson's two statements to the juvenile court rose to the level of criminal contempt.

OCGA § 15-11-5 (a) provides that the juvenile court "may punish a person for contempt of court for willfully disobeying an order of the

court or for obstructing or interfering with the proceedings of the court or the enforcement of its orders, subject to the law relating to the procedures therefor and the limitations thereon." Citing to the United States Supreme Court's decision in *Wood v. Georgia*, 370 U. S. 375 (82 SC 1364, 8 LE2d 569) (1962), our Supreme Court has held that "[t]he test applied to determine whether a statement is contemptuous is whether [the statement represents] a clear and present danger to [the] orderly administration of justice." *Garland v. State*, 253 Ga. 789, 790 (2) (325 SE2d 131) (1985).

There is no bright line test for determining when conduct poses such a clear and present danger, because such an assessment "can be made only after taking into account the setting in which the statement is made." *Garland*, 253 Ga. at 791 (2). To be considered criminal contempt, however, the conduct must include acts that interfere with a litigant's ability to receive a fair trial or otherwise obstruct the administration of justice. See id.; *McDaniel v. State*, 202 Ga. App. 409 (414 SE2d 536) (1992). Furthermore, "criminal contempt is a crime in the ordinary sense and the evidence of the contempt must be beyond a reasonable doubt. Contempt is a drastic remedy which ought not to deprive one of [his] liberty unless it rests upon a firm and proper basis." (Citations and punctuation omitted.) *Salter v. Greene*, 226 Ga. App. 384, 385 (1) (486 SE2d 650) (1997). See also *Hartman v. Lyng*, 884 F2d 1103, 1106 (8th Cir. 1989) ("Because the contempt power is a substantial one, it should be used sparingly and not be lightly invoked."); *In re Spruell*, 227 Ga. App. 324, 325 (1) (489 SE2d 48) (1997).

The need for caution before finding criminal contempt is particularly necessary "in the case of an attorney who is attempting to be heard on behalf of his client." *Calhoun v. Findley*, 168 Ga. App. 634, 638 (309 SE2d 907) (1983). In this respect, this Court has previously held as a matter of law:

> "*The arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge in the performance of his judicial duty[.]. . .* While we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom, or even from conduct so near to the court as actually to obstruct justice, it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases." *In [re] McConnell*, 370 U. S. 230, 236 (82 SC 1288, 8 LE2d 434)

(1962). Accord *In re Brookins*, 153 Ga. App. 82 (264 SE2d 560) (1980). See also *In [re] Little*, 404 U. S. 553 (92 SC 659, 30 LE2d 708) (1972).

(Emphasis supplied.) Id. at 638. See also *In re Bryant*, 188 Ga. App. 383, 384-386 (2) (373 SE2d 74) (1988). Jefferson's two statements must be examined in light of these principles.

(a) Jefferson was found in contempt for stating, "[T]hat's a gross interference with the way that I can represent my client, your Honor" in response to the juvenile court's ruling that she could not question the investigating officer about the shooter's statement before first calling the shooter himself to the stand. In making the statement, Jefferson was articulating the basis for her objection to the trial court's ruling, albeit in a strenuous manner. But, as pointed out above, vigorous argument made as part of articulating an objection, in and of itself, cannot serve as the basis for a finding of contempt, even if the objection was ultimately ill-founded. See, e.g., *In re Bryant*, 188 Ga. App. at 384-386 (2); *Calhoun*, 168 Ga. App. at 637-638. Rather, in order to be contemptuous, the argument must "in some way create an obstruction which blocks the judge in the performance of his judicial duty." *In re McConnell*, 370 U. S. at 236.

The record reflects no such obstruction in the present case. There is no allegation that Jefferson violated a previous court order in making the statement, or that the statement was made after Jefferson had already been warned by the trial court based on prior improper statements. Compare *Garland v. State of Ga.*, 101 Ga. App. 395 (114 SE2d 176) (1960). Furthermore, the statement occurred in a bench trial rather than before a jury; the statement was made as part of the argument regarding the order and admissibility of evidence; the juvenile court hearing the contempt matter expressly found that there was no evidence that Jefferson had ever addressed the court in a disrespectful tone or with an improper demeanor during the bench trial; the trial proceeded after the statement with Jefferson abiding by the court's ruling; and there is no indication in the record that the statement otherwise disrupted or delayed the proceedings in any manner. Under these circumstances, Jefferson's statement did not create an actual or potential obstruction that blocked the juvenile court from performing its duties.

While the majority relies upon *White v. State of Ga.*, 218 Ga. 290 (127 SE2d 668) (1962) to support its position, the trial court in that case specifically found that the attorney had made the statements at issue, as well as other remarks throughout the proceedings, in a disrespectful and discourteous manner. Id. at 293 (2) (b). The juvenile court hearing the contempt action in the present case found the exact opposite.

(b) Jefferson also was found in contempt for stating "I just want the record to reflect with much respect, Your Honor, . . . I just find the Court is biased in its view. You say that you're not prejudging the case but it seems to me like you've made up your mind and any and everything I do to effectively defend my client I'm being rebutted." While the transcript of the delinquency hearing does not support a finding of bias, the fact that Jefferson was substantively wrong on this issue does not in itself render her allegation of bias contemptuous. See *Holt v. Virginia*, 381 U. S. 131, 136-138 (85 SC 1375, 14 LE2d 290) (1965); *In re McLarty*, 152 Ga. App. 399, 400-401 (2) (263 SE2d 194) (1979).

Notably, the United States Supreme Court in *In re Little*, 404 U. S. at 555-556, overturned the criminal contempt conviction of a party who protested that the trial court "was biased and had prejudged the case" in open court during a jury trial. The Supreme Court explained:

> There is no indication, and the State does not argue, that petitioner's statements were uttered in a boisterous tone or in any wise actually disrupted the court proceeding. Therefore, the vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil. The law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate. Trial courts must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.

(Citations and punctuation omitted.) Id. at 555. The Supreme Court went on to note that the reversal of the contempt conviction was "necessarily required" under its prior holding in *Holt v. Virginia*, 381 U. S. at 136-138, where the Court had held that an attorney could not be held in contempt merely for filing a motion to recuse a trial judge on the grounds of partiality and bias. *In re Little*, 404 U. S. at 556.

The present case is squarely controlled by *In re Little*. As in that case, in arguing that the juvenile court was biased, Jefferson did not use any derogatory language or epithets, and, as previously noted, there is no evidence in the record that Jefferson had a disrespectful tone or demeanor. Furthermore, the statement in the present case carried even less potential of disrupting the proceedings than the statement in *In re Little*, since the statement in that case occurred

during a jury trial, whereas the statement here occurred in a bench trial before a juvenile court that was closed to the public.

Finally, Jefferson's statement appears in part to have been responsive to the juvenile court's sua sponte statements, made several times during the course of the case, that he was not going to prejudge the matter. Jefferson's protest must be read in this context.

For these reasons, as well as the other attendant facts and circumstances discussed above in subsection (a), I believe that the juvenile court erred in finding Jefferson in criminal contempt based on her statement that the court was biased. See *In re Little*, 404 U. S. at 555-556; *Holt*, 381 U. S. at 136-138; *In re McLarty*, 152 Ga. App. at 400-401 (2).[1]

In closing, I believe that Jefferson's two statements offended the precept that "[c]ivility and courtesy should be hallmarks of the legal profession." *Garland*, 253 Ga. at 792. The issue before this Court, however, is "the narrow issue of criminal contempt and its even narrower limitation of clear and present danger." Id. Applying the relevant law, I cannot find that these statements constituted criminal contempt.

I am authorized to state that Chief Judge Barnes and Judge Miller join in this opinion.

DECIDED MARCH 30, 2007 —
RECONSIDERATION DENIED APRIL 11, 2007 — 

*Sherri J. Jefferson*, pro se.

---

[1] The majority appears to suggest that the finding of contempt could be based in part on a finding that Jefferson improperly continued to argue with the juvenile court after it had ruled on the issue at hand. However, the juvenile court hearing the contempt action expressly found that a finding of contempt could not be predicated on the allegation that Jefferson continued arguing with the court after it made its rulings, noting especially that there was no evidence in the record that Jefferson "was put on notice such continued advocacy was deemed contemptuous." Neither party challenges this finding on appeal.